UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 7[1] |
| | ) | |
| AIRFASTTICKETS, INC. | ) | Case No. 15-11951 (SHL) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

**DEBTOR'S MOTION (I) FOR AUTHORIZATION TO (A) SELL SUBSTANTIALLY ALL OF ITS PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS AND (B) ASSUME AND ASSIGN CONTRACTS AND (II) FOR APPROVAL OF PROCEDURES FOR DETERMINING CURE AMOUNTS**

AirFastTickets, Inc., a Delaware corporation (the "**Debtor**"), by and through its undersigned counsel, hereby files this motion (this "**Motion**") pursuant to 11 U.S.C. §§ 105(a), 363(b), (f), and (m), and 365, Fed. R. Bankr. Proc. 2002, 6004, and 6006 and Local Rules 6004-1 and 6006-1 for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Sale Order**") (i) authorizing (a) the private sale of the Property (as defined below) (the "**Sale**") to the AirTourist, Inc. (the "**Buyer**") free and clear of all liens, claims, encumbrances, and other interests; (b) the Debtor's entry into that certain Purchase and Sale Agreement dated October __, 2015, a copy of which is attached hereto as **Exhibit B** (the "**Purchase and Sale Agreement**") and (c) the Debtor to assume and assign certain Contracts in accordance with the Assumption Procedures set forth herein; (ii) granting the Buyer the protections afforded a good faith purchaser by section 363(m) of the Bankruptcy Code; and (iii) approving procedures (the "**Assumption Procedures**") for the assumption and assignment to Buyer of executory contracts (collectively, the "**Contracts**") and the determination of the amount of cure obligations (the

---

[1]  The Debtor filed its motion to convert the chapter 7 case to chapter 11 [ECF No. 10].  The hearing on the motion to convert will be held on October 27, 2015 at 10:00 a.m.

"**Cure Amounts**"), if any, related thereto.  The Sale is contemplated to be a private sale without further marketing, but remains subject to higher and better offers.  In support of this Motion, the Debtor submits the Declaration of Adam Meislik (the "**Meislik Declaration**"), a copy of which is attached hereto as **Exhibit C**, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue of these proceedings and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

## BACKGROUND

A.      **The Chapter 7 Case**

2.      On July 27, 2015, certain of the Debtor's creditors (the "**Petitioning Creditors**") filed an involuntary petition against the Debtor seeking an order for relief under chapter 7 of the Bankruptcy Code.  Pursuant to the summons issued in conjunction with the involuntary petition, the Debtor had until August 21, 2015 to respond to the involuntary petition.

3.      On August 20, 2015, the Petitioning Creditors filed a stipulation with the Court extending the Debtor's time to respond to the involuntary petition, through and including September 21, 2015.

4.      On September 21, 2015, the Debtor filed an answer, consenting to the entry of an order for relief under the Bankruptcy Code.  The Debtor also filed its *Motion to Convert Chapter 7 Case to Chapter 11 Pursuant to 11 U.S.C. § 706(a)* (the "**Motion to Convert**") seeking to convert the Debtor's case to one under chapter 11 of the Bankruptcy Code.  The Motion to Convert was filed to accomplish the Debtor's intent to effectuate the sale at issue in this Motion

RLF1 13165524v.3

under chapter 11.   A hearing to consider the Motion to Convert is currently scheduled for October 27, 2015.

5.      No order for relief has been entered to date.   It is expected that an order for relief will be entered at or shortly after the October 27 hearing.   Thus, as of the date of this motion, the Debtor is still operating in the gap period.

**B.      Events Leading Up to Chapter 7 Petition**

6.      The Debtor is a Delaware corporation that used proprietary software that it developed and owns to help consumers find low cost domestic and international airfares.   In that regard, the Debtor's model was similar to the airline ticketing services provided by Expedia.com and other online travel agencies.   In order to operate in this line of business in international markets, the Debtor was required to be licensed by the International Air Transport Association ("**IATA**").   IATA is the trade association for the world's airlines, representing more than 250 airlines and approximately 85% of the world's total air traffic.

7.      The Debtor operated a multi-national business, together with several of its wholly owned foreign subsidiaries (the "**Subsidiaries**").   None of the Subsidiaries are Debtors in this case.   One had an administrator appointed in the United Kingdom, and the Debtor is taking appropriate actions with its Subsidiaries in Germany and Greece.

8.      The Debtor was founded in 2011 by Nikoloas Koklonis, who served as the Debtor's sole director, sole officer and controlling stockholder from its formation until approximately December 2014.   Leading up to June 2014, the Debtor and its Subsidiaries ceased remitting payment for its ticket sales to the airlines.   In June 2014, IATA revoked the Debtor's license, which – for all intents and purposes – put the Debtor and Subsidiaries out of business as it knew it.   Without an IATA license, the Debtor could not purchase tickets in the international market to resell, and therefore, had no way to earn money.   At the time its license was revoked,

3

the Subsidiaries (but not the Debtor) owed over $70 million to over 400 airlines and approximately $25 million to vendors.

### (i)    Debtor's Business After June 2014

9.    After IATA revoked the Debtor's license, the Debtor and Subsidiaries attempted to stay in business by purchasing airline tickets through ticket consolidators rather than directly through the airlines.  Ticket consolidators purchase tickets directly from the airlines at specially negotiated rates and then resell the tickets to customers for less than published fares; the Debtor and/or Subsidiaries attempted to purchase from the consolidators at these discounted rates and sell to customers for a profit.  After June 2014, it was alleged by Mr. Koklonis that due to the delay in payment by certain consolidators, the Debtor was suffering from severe liquidity issues and did not have sufficient funds to pay its employees or continue operations.  At this time, Mr. Koklonis began looking for investors or lenders to provide the Debtor with an influx of cash.

10.    Around September 2014, Mr. Koklonis became acquainted with Jason Chen, an investor with connections to other investors ("**Bridge Loan Investors**") who could facilitate the Debtor obtaining the capital it needed to continue operating until certain payments by consolidators became due (which was originally purported to be between March and April of 2015).

11.    From October 2014 through January 2015, certain investors entered into a series of agreements with the Debtor for a purportedly secured loan (the "**Bridge Loan**").  Under the Bridge Loan, the investors loaned the Debtor $15 million between October 2014 and June 2015, secured solely by the Debtor's receivables.[2]  In accordance with the terms of the Bridge Loan, Mr. Koklonis provided the investors with monthly or bi-monthly reports summarizing ticket

---

[2] As set forth below, it turned out that there were no receivables.  Thus, no collateral secures this claim.

sales.  These reports indicated that the Debtor recorded a total of $36 million in accounts receivable from July to December of 2014, and an additional $5.8 million of accounts receivable during the first quarter of 2015.

12.      As a condition for the Bridge Loan, the Debtor and Mr. Koklonis agreed that the Debtor would have a three-member Board, and that both Mr. Chen and his wife, Lisa Chen, would be appointed as two of the three directors of on the Board of Directors.  On December 15, 2014, the Chens were appointed to the Board by written consent of the then sole director, Mr. Koklonis.  Mr. Chen was also appointed Chief Executive Officer.

13.      The receivable payments were not received by the due date in April 2015.  At this time, Mr. Chen insisted that the Debtor retain a financial consultant to assist with the restructuring of the Debtor and to look into the Debtor's operations and finances.  On April 15, 2015, the Debtor retained GlassRatner Advisory and Capital Group, LLC ("**GlassRatner**") as its restructuring financial advisor.

14.      When the receivable payment was not made by the due date, Edgar D. Park, the collateral agent under the Bridge Loan, insisted on speaking directly to the consolidators.  Mr. Koklonis provided Mr. Park with the contact information for the consolidators which, it was later learned, was fabricated.  Despite Mr. Park's efforts to contact the consolidators, the receivables were never paid.  At this time, GlassRatner conducted additional diligence on the Debtor's accounting processes.

15.      In addition, in April 2015, Mr. Koklonis informed Mr. Chen that the Debtor needed to pay a critical vendor named Amphion Efthymia Ltd. ("**Amphion**") to avoid serious business disruption.  After discussions between Mr. Chen and a purported representative of

5

Amphion, Mr. Chen caused the Debtor to wire $400,000 to the Debtor's Greek subsidiary to pay Amphion.

### (ii)    The Alleged Fraud

16.    In late May and early June 2015, the Debtor's board of directors, certain managers and restructuring legal and financial advisors met to discuss alternatives to help the Debtor recover from its severe insolvency, including a possible restructuring or bankruptcy. While those discussions were underway a game changing event occurred:  on June 4, 2015, the Debtor's Chief Technology Officer/Head of IT informed Mr. Chen that Mr. Koklonis had been perpetrating a massive fraud on the investors and provided documentation as evidence of that fraud.

17.    The alleged fraud is that Mr. Koklonis allegedly created fake receivables, contacts and communications to trick investors into loaning the Debtor money and thwart an investigation, and then created at least one fake vendor to siphon the money that the Debtor received from investors out of the Debtor and into his own pocket.

18.    On June 6, 2015, after discovering the alleged fraud, the other two directors of the Debtor (Mr. and Mrs. Chen) gave notice of an emergency special meeting of the Board of Directors to be held on June 7, 2015.  That same day, Mr. Koklonis purported to terminate Mr. Chen as Chief Executive Officer, remove Mr. Chen and Ms. Chen as directors, terminate several professionals retained by the Debtor and cancel the emergency meeting.  Notwithstanding Mr. Koklonis' efforts, the June 7 meeting went forward.  At that meeting, among other decisions, the Board approved emergency resolutions (a) to the extent Mr. Koklonis was the Debtor's CEO, to immediately remove him from his offices at the Debtor for cause, and (b) to appoint Mr. Adam Meislik, a Senior Managing Director at GlassRatner and Co-President and Chief Compliance Officer at GlassRatner Securities, LLC, as the Debtor's Chief Restructuring Officer, which

would place him in charge of the Debtor's operations and authorize him to take all actions necessary to protect creditors and the Debtor's assets (if any).  Mr. Meislik did not attend the special meeting and did not accept his appointment in light of the competing governance efforts. The Chens also filed suit in Los Angeles to appoint a Receiver.  The case was dismissed for lack of proper venue.   Nonetheless, the Chens sought to insulate the Debtor from further fraud through their governance efforts.

### (iii)    *The Chancery Court Actions*

19.     Concurrently, Mr. Koklonis attempted to regain control of the Debtor by filing a complaint in the Delaware Court of Chancery ("**Chancery Court**"), seeking a judicial determination that he was the sole director, Chairman of the Board, CEO, President and majority stockholder of the Debtor (the "**225 Action**").  In connection with the 225 Action, Mr. Koklonis filed a motion to maintain the *status quo* of the Debtor pending resolution by the Chancery Court of the underlying action.

20.     The defendants in the 225 Action, Mr. Chen, Ms. Chen and Mr. Meislik, responded to the motion by informing the Chancery Court of the alleged fraud.  Due to the seriousness of the defendant's allegations, on June 19, 2015, the Chancery Court determined that a *status quo* order would not provide adequate protection for the Debtor or other parties in interest.  Instead, the Chancery Court *sua sponte* appointed Mr. Meislik as custodian *pendente lite*.  The Chancery Court also, in that same order, dismissed Mr. Meislik as a defendant because "[t]he petition named Adam Meislik as a defendant based on a misapprehension of the facts under which he was believed to serve as a director.  He is not serving as a director and is therefore dismissed as a defendant."  At the same time, the Chancery Court suggested that Mr. Meislik be appointed as a receiver pursuant to 8 DEL. C. § 291.

RLF1 13165524v.3

21.     Given that suggestion by the Court, on June 27, 2015, Mr. Park filed an action in the Chancery Court to appoint Mr. Meislik as receiver for the Debtor.  On July 21, 2015, the Court of Chancery appointed Mr.  Meislik as receiver for the Debtor.  In addition to that title, the Chancery Court's order broadly gave Mr. Meislik all of the powers of the Debtor's Board of Directors and Officers and made him the sole person authorized to act on behalf of the Debtor.

22.     As Receiver, Mr. Meislik promptly took over cash management, and reduced the Debtor's operating expenses primarily through headcount reductions, and secondarily through curtailing third-party services and rationalizing a real property lease.  Mr. Meislik also took steps to reduce the Debtor's exposure to the acts of the Subsidiaries, including reducing headcount in the Greek subsidiary and hiring insolvency professionals in Greece and Germany.

23.     The Debtor and Subsidiaries have not sold any tickets in 2015.  While it attempted to continue operating after losing its IATA license by instead using ticket consolidators, even those efforts were abandoned long ago.

**C.     <u>Sale Process</u>**

24.     As set forth above, the commencement of this case was precipitated by, among other things, the loss of the IATA license, the shutdown of the Debtor's operations and business due to the lack of IATA license and the alleged fraud by Mr. Koklonis.  As a result of the investors' concerns about the Debtor's financial condition, in April 2015, the Debtor retained GlassRatner as financial advisor to advise and assist the Debtor in, among other things, pursuing both out-of-court and in-court restructuring alternatives, including a potential sale of the Debtor's assets or other proposed transactions.

25.     Prior to the decision to pursue a sale, the Debtor and its advisors reached out to investors regarding a potential transaction with the Debtor.  Due to its liquidity issues and lack of ability to operate, all investors declined to pursue a transaction with the Debtor.  Upon review of

RLF1 13165524v.3

the company's assets and liabilities, Mr. Meislik determined that the intellectual property, mainly software code and customer information, could be monetized through a sale. Mr. Meislik also determined that the Debtor has potential recovery through avoidance actions and other litigation claims. Although the reality of Debtor's situation was vastly different than presented to the Bridge Loan Investors and other investors, a sub-set of the Bridge Loan Investors and Mr. Meislik entered into due diligence and negotiations surrounding the Debtor's intellectual property.

26.    Upon being retained, GlassRatner contacted a number of strategic buyers regarding a potential sale of the Debtor's business. Due to the lack of operations and the Debtor's financial position, as well as the allegations of fraud, the strategic buyers declined to pursue a sale. The Buyer is the only party (other than Mr. Koklonis as discussed further below) that has expressed a bona fide interest in pursuing a transaction with the Debtor.

27.    Based on GlassRatner's experience with respect to similar transactions and knowledge of the Debtor, due to the fact that the Debtor's only asset is its intellectual property and related property, and the Debtor has had no operations for at least six months (and curtailed operations for twelve months before that), GlassRatner does not believe that there is any party, other than the Buyer (and possibly Mr. Koklonis), that would be interested in pursuing a transaction with the Debtor. GlassRatner further believes that the expenses associated with an extensive post-petition marketing process would far outweigh any benefit. Moreover, the Company lacks sufficient cash to fund a lengtheir chapter 11 auction process, so attempting to proceed down that path is not feasible.

28.    Further, upon execution of the Purchase and Sale Agreement, the Debtor contacted Mr. Koklonis regarding the Sale and other potential purchasers. At various times

throughout the sale process, Mr. Koklonis has asserted that he has knowledge of parties interested in pursuing a transaction with the Debtor. Mr. Koklonis has expressed an interest in pursuing a transaction with the Debtor since as early as April 2015 and at various times since; but despite having full knowledge that a sale was being pursued, he has not provided the Debtor with an offer for the assets. Due to the alleged fraud committed by Mr. Koklonis to the detriment of the Debtor and its creditors and the Debtor's belief that Mr. Koklonis has attempted to interfere with the Sale with the Buyer, the Debtor determined that it was not appropriate to contact Mr. Koklonis prior to entry into the Purchase and Sale Agreement. However, once the Purchase and Sale Agreement was been signed, the Debtor promptly contacted Mr. Koklonis, informing him of the proposed sale. The Debtor believes that Mr. Koklonis has had ample opportunity to provide the Debtor with an offer for the Property. In addition, he knows the business better than anyone else, so the timing requested for approval of the Sale provides Mr. Koklonis with sufficient time to evaluate the Sale and Purchase Agreement and make an offer for the Property. Given the concerns set forth in paragraph 27, *supra*, the Debtor does not intend to contact any other potential purchaser, but will of course evaluate any offer that is received, consistent with the terms of the Purchase and Sale Agreement.

**D.    The Sale**

29.    The Debtor has entered into the Purchase and Sale Agreement with the Buyer for the sale of the substantially all of the Debtor's intellectual property and software and certain related assets (collectively, the "**Property**"). In light of the fact that the Debtor is no longer an operating business and has no further funding, the Debtor believes that no further marketing efforts are necessary and that the costs of engaging in any further marketing of the Property would outweigh any benefit that might be derived from such marketing. In fact, it is the Debtor's belief that there are no other parties interested in purchasing the Property, other than

perhaps Mr. Koklonis.  Nonetheless, as set forth in greater detail below, consistent with the Debtor's fiduciary duties to maximize value, the Sale is subject to higher and better offers and will maximize the value for the Debtor's estate and its creditors.

30.     The Debtor seeks approval of the Sale 21 days from today or as soon thereafter as the Court can hear this Motion.  Given that the Debtor does not intend to market the Property and lacks the liquidity for a longer sale process, the Debtor respectfully submits that the timing is in the best interests of all parties in interest.

## RELIEF REQUESTED

31.     Pursuant to sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Bankruptcy Rules 6004-1 and 6006-1, the Debtor seeks entry of an order, to be deemed effective immediately upon entry by waiving the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d), substantially in the form attached hereto as **Exhibit A** (the "**Sale Order**"): (i) authorizing (a) the private sale of the Property to the Buyer free and clear of all liens, claims, encumbrances, and other interests, (b) the Debtor's entry into the Purchase and Sale Agreement and (c) the Debtor to assume and assign certain Contracts in accordance with the Assumption Procedures set forth herein; (ii) granting the Buyer the protections afforded a good faith purchaser by section 363(m) of the Bankruptcy Code; and (iii) approving the Assumption Procedures.

## SALE OF THE ASSETS

**A.      Overview of the Proposed Transaction**

32.     The principal terms of the Sale and Purchase Agreement are summarized in the following chart:[3]

---

[3]      Capitalized terms used but not otherwise defined in the summary chart shall have the meaning ascribed to such terms in the Purchase and Sale Agreement.  This summary is provided for convenience of the Court and parties

| SUMMARY DESCRIPTION | |
|---|---|
| **Parties** | <u>Seller</u>: AirFastTickets, Inc.<br><br><u>Buyer</u>: AirTourist, Inc. |
| **Property** | (a) All Intellectual Property and Software set forth on <u>Exhibit A</u> to the Purchase and Sale Agreement, including all designs, code, domain names, and licenses set forth on Exhibit A to the Purchase and Sale Agreement;<br>(b) Subject to Section 1.1(e)(i) of the Purchase and Sale Agreement, Data, lists, records and other proprietary information as set forth on Exhibit A to the Purchase and Sale Agreement;<br>(c) Seller's rights and interests in all "Assumed Contracts" as set forth on Exhibit B to the Purchase and Sale Agreement;<br>(d) the tangible property and office equipment set forth on Exhibit A to the Purchase and Sale Agreement;<br>(e) all documents that are used in, held for use in or intended to be used in, or that arise out of, the Seller's business, including documents relating to services, marketing, advertising, promotional materials, Purchased Intellectual Property, customer files and documents (including all customer contact and credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premise referred to in Exhibit A, but excluding (i) such documents as may be required under applicable law regarding privacy or that are prohibited from being transferred due to section 363(b) of the Bankruptcy Code, which shall be Excluded Property, and (ii) any documents exclusively related to any Excluded Property;<br>(f) all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the business or the purchased Property (or any portion thereof); and<br>(g) subject to the provisions of section 363(b)(1)(A) of the Bankruptcy Code, all goodwill and other intangible assets associated with the Purchased Intellectual Property. |
| **Purchase Price** | $2,500,000.00 |
| **Deposit** | $250,000 (the "**Deposit**") |
| **Pre-Closing Procedures** | (a) the filing of this motion (the "**Sale Motion**") in a form reasonably acceptable to the Buyer and the Seller. The Sale Order shall be substantially in the form attached as Exhibit H to the Purchase and Sale Agreement.<br>(b) Seller shall request the Bankruptcy Court hold the hearing seeking entry of the Sale Order (the "**Approval Hearing**") within 21 days after the Sale Motion is filed and the Approval Hearing shall be held within 21 days after the Sale Motion is filed or at such later date that the Bankruptcy Court schedules the Approval Hearing.<br>(c) In the event that Seller receives one or more Qualified Bids (as defined below), an Auction as described in Section 5.3 of the Purchase and Sale Agreement for the sale of the Property shall occur no earlier than two (2) business days before the Approval Hearing. If an Auction is not held, the Approval Hearing will be held within four |

in interest. To the extent there is any conflict between this summary and the Purchase and Sale Agreement, the latter governs in all respects.

RLF1 13165524v.3

| | |
|---|---|
| | (4) business days of the Overbid Deadline.<br>(d)  Objections to the Sale Motion will be due five (5) business days before the Approval Hearing.<br>(e)  The Sale Order shall be entered and become a final order no later than forty-one (41) days after the Sale Motion is filed. |
| **Alternative Transactions and Auction** | **Alternative Transactions.**  After the filing of the Sale Motion, this Agreement shall be subject to Seller's consideration of higher or better bids (each, an "**Alternative Transaction**").<br><br>For an Alternative Transaction to be a qualified bid (each, a "**Qualified Bid**"), it must be:<br><ul><li>in writing;</li><li>received by Seller and Buyer by four (4) business days prior to the Approval Hearing (the "**Overbid Deadline**");</li><li>a firm bid of at least $50,000 over the sum of the Purchase Price, the Break-Up Fee, and the maximum Expense Reimbursement (the "**Minimum Overbid**");</li><li>a firm, unconditional bid to purchase the Property, not subject to any contingencies, including, without limitation, further due diligence review or financing;</li><li>accompanied by sufficient information to demonstrate that the bidder submitting the Alternative Transaction for approval as a Qualified Bid (the "**Overbidder**") has the financial wherewithal and ability on its own without reliance on third party funding sources, to timely consummate the acquisition of the Property on terms and conditions substantially the same as this Agreement, including evidence of adequate financing and a financial guaranty, if appropriate;</li><li>accompanied by a declaration identifying any and all insiders of the Seller that either own an interest in the Overbidder (and the amount of the interest owned) or who have otherwise made an agreement with the Overbidder as to the Property (and the terms of such agreement);</li><li>accompanied by a signed contract substantially in the form of this Agreement, marked to show any changes made (excluding provisions specific to Buyer as a stalking horse bidder); and</li><li>accompanied by a good faith cash deposit in an amount equal to 10% of the Overbidder's purchase price on or before the Overbid Deadline.</li></ul><br>**Auction.**  If one or more Qualified Bids are received, an auction ("**Auction**") for the Property shall be held.<br><br><ul><li>If Seller determines that a Qualified Bid is a higher or better bid than the Purchase Price hereunder, Buyer shall have the opportunity to increase its Purchase Price such that it will enter the Auction as the opening bid, and, in connection therewith, Buyer shall be entitled to credit its Break-Up Fee and the maximum Expense Reimbursement against the purchase price reflected in such Qualified Bid; Buyer shall also have the opportunity to increase its Purchase Price in response to any overbid at such Auction.</li><li>Seller shall evaluate all Qualified Bids received and shall determine which Qualified Bid reflects the highest or best</li></ul> |

13

| | |
|---|---|
| | offer for the Property (the "**Starting Auction Bid**").  Seller shall announce its determination of the Starting Auction Bid at the commencement of the Auction. |
| | • The first incremental competitive bid at the Auction shall be at least $50,000 over the Starting Auction Bid, with any subsequent increases of bids to be made in increments equal to at least $50,000, and (i) no bids shall be considered by Seller unless a party submitted a Qualified Bid and participates in the Auction and (ii) all of the Property shall be sold in a single lot. |
| | • When determining the highest or best bid, Seller shall include the Break-Up Fee and the maximum Expense Reimbursement in Buyer's last bid, which Break-Up Fee and the maximum Expense Reimbursement would otherwise be payable to Buyer. |
| | • In the event that Seller determines in good faith that it has not received a Qualified Bid by the Overbid Deadline that is a higher or better bid than the one represented by this Agreement, Seller shall seek approval of this Agreement at the Approval Hearing (to be held within four (4) business days of the Overbid Deadline) without conducting an Auction and without further motion or adjournment without the written consent of Buyer. |
| **Break-Up Fee and Expense Reimbursement** | Buyer shall be entitled to a break-up fee ("**Break-Up Fee**") of $100,000 plus an expense reimbursement up to $150,000 for reasonable documented costs and expenses incurred in connection with the transactions contemplated herein ("**Expense Reimbursement**") should the Buyer not be the successful purchaser of the Property at the Auction.  The Break-Up Fee and Expense Reimbursement shall only be due by Debtor (i) if Debtor enters into and consummates any transaction in which Debtor sells, transfers, or otherwise disposes of, directly or indirectly, all or a substantial portion of the Property to a party or parties other than Buyer, (ii) if Debtor terminates the Purchase and Sale Agreement (in accordance with the terms thereof) for any reason other than Buyer being in breach of the agreement and ultimately enters into and consummates a transaction with a third party in which seller sells, transfers, or otherwise disposes of, directly or indirectly, all or a substantial portion of the Property, or (iii) if Buyer terminates the Purchase and Sale Agreement due to breach by Debtor other than a breach of a representation or warranty.   The break-up fee and expense reimbursement shall be a superiority administrative expense of Debtor's estate allowed under section 507(a)(2) of the Bankruptcy Code and shall be payable by debtor prior to payment of any other prepetition creditor. |

14

**B.**  **Summary of "Extraordinary Provisions" Pursuant to the Guidelines For The Conduct of Asset Sales Under the Local Bankruptcy Rules**

33.  **Sale to Insider -** The Debtor has been informed that Mr. Chen is the Chief Executive Officer of the Buyer, which is a newly formed entity[4].  Although Mr. Chen was a member of the Debtor's Board of Directors for a brief period of time, Mr. Chen is no longer an insider of the Debtor and has had no power or control of the Debtor during the sale process.  Specifically, as of June 19, 2015, when the Chancery Court appointed Mr. Meislik custodian *pendente lite* of the Debtor, Mr. Chen and the other members of the Debtor's Board of Directors as well as its officers no longer had any ability to control the Debtor and its business, operations and corporate decision making and actions.  Since June 2015 and at all times during the negotiation of the Sale and the Purchase and Sale Agreement, Mr. Meislik has been the sole individual designated with the authority and power to negotiate and make decisions on behalf of the Debtor.

34.  Further, the Debtor has been informed that the stockholders of the Buyer are a subset of the Bridge Loan Investors.  In addition, the Debtor has been informed that the HNA Group or one of its affiliates, which was one of the Bridge Loan Investors, is the majority stockholder of the Buyer.

35.  **Private Sale** - As set forth herein in greater detail, the Debtor has not been an operating business in many months, has extremely limited funding and is only selling certain intellectual property assets.  Accordingly, the Debtor does not believe that further marketing or conducting an auction with respect to such assets would procure a higher or better offer.  The Debtor submits that the terms memorialized in the Purchase and Sale Agreement constitute the

---

[4]  The Debtor has been informed by the Buyer that the Debtor's Chief Technology Officer might receive a post-sale offer of employment by the Buyer.  The Chief Technology Officer is not presently a shareholder ,or officer or director of the Buyer.

highest and otherwise best offer for the Property. However, if another interested party submits a Qualified Bid, the Purchase and Sale Agreement provides for a process in which an auction may take place. Accordingly, if no higher and better offer for the Property is received, then the Debtor intends to sell the Property without conducting an auction.[5]

36.    **No Successor Liability** - The Purchase and Sale Agreement provides, and the proposed Sale Order includes certain findings, that the Buyer will not be liable for any and all liabilities, liens, claims and encumbrances against the Property. In light of the notice provided to all parties in interest, the Debtor believes affected parties will have sufficient notice of the Sale and therefore, inclusion of successor liability findings in the Sale Order is appropriate and reasonable, especially balanced against the benefits of the Sale.

37.    **Requested Findings as to Fraudulent Conveyance** - The Sale Order provides that the Purchase and Sale Agreement are not subject to avoidance under any fraudulent conveyance statute.

38.    **Relief from Stay Under Bankruptcy Rules 6004(h) and 6006(d)** - The Sale Order provides for a waiver of the 14-day stay of the Sale Order arising under Bankruptcy Rules 6004(h) and 6006(d). A waiver of the stay is necessary to maximize as soon as possible the value that the Debtor may realize from the sale of the Property, especially in light of the Debtor's liquidity concerns and lack of operations. Moreover, notice of the Sale was and will be further adequately provided to all parties in interest. Therefore, the Debtor submits there are adequate grounds to waive the 14-day say under Bankruptcy Rules 6004(h) and 6006(D) so that the Sale Order is effective immediately.

---

[5] To the extent it constitutes an "extra ordinary provision," the Debtor also states that it seeks approval of the Sale 21 days from today. *See supra* ¶ 30

RLF1 13165524v.3

39.     **Sale of Personally Identifiable Information** - Pursuant to the Purchase and Sale Agreement the sale to Buyer of personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) of individuals, if any, is consistent with the privacy policy of the Debtor in effect prior to the date of the filing of the case.   Specifically, the Debtor's privacy policy expressly states that the Debtor may sell such information and transfer such information pursuant to a transaction similar to the Sale.

40.     **Sale of Claims against Jason Chen and Lisa Chen** - Pursuant to the Purchase and Sale Agreement, the Buyer required, and the Debtor agreed, to sell all claims and rights held by Seller against Jason Chen and Lisa Chen arising from any action or circumstance during their engagement with the Debtor, including all derivative claims, for negligence, breach of contract, fiduciary duty, or any other theory of liability.   In exchange for the sale of such claims, at closing, Jason Chen and Lisa Chen will execute a waiver of claims for indemnification against the debtor pursuant to the Bylaws of the Debtor, including costs, expenses and legal fees (but are not waiving claims for principal, interest and other claims relating to the Notes).

C.      **Sale of the Property is Appropriate**

41.     Ample authority exists for the approval of the Sale pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code.   Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   Section 105(a) of the Bankruptcy Code, which confers broad powers on bankruptcy courts, provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."   11 U.S.C. § 105(a).

42.     The decision to use and sell property of the estate outside the ordinary course of business is entrusted to the sound business judgment of the debtor.   *See, e.g.*, *Myers v. Martin (In*

17

re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that to obtain court approval to sell property under section 363(b), a debtor must show a "sound business reason" for the proposed action); *see also In re Integrated Res., Inc.*, 147 B.R. at 656 (S.D.N.Y. 1992) (stating "the business judgment rule is a presumption that in making a business decision the directors the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company" and has continued applicability in bankruptcy (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

43.    Where the "debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that a debtor acted "in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.  *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).  A section 363 sale should be approved if the Court is satisfied that the debtor has (a) exercised its sound business judgment; (b) the debtor has provided adequate notice; (c) the purchaser has proceeded in good faith; and (d) the purchase price is fair.  *See In re Del. & Hudson Ry. Co.*, 124 B.R. at 176.  The Sale satisfies each condition.

44.     The Debtor's decision to sell the Property is based upon the exercise of its sound business judgment.   The Debtor believes that the Sale pursuant to the Purchase and Sale Agreement is in the best interest of the Debtor and its creditors because it provides for sufficient cash and other consideration to, among other things, wind down the Debtor's estate for the benefit of its creditors.

45.     The Debtor has negotiated with the Buyer in good faith.   The Purchase and Sale Agreement and terms of the Sale proposed herein have been heavily negotiated at arm's length and the Debtor strongly believes that the Purchase and Sale Agreement represents the highest and otherwise best offer for the Property.

46.     Based on the foregoing, the Debtor submits that the Sale is in the best interest of the Debtor's estate and the Debtor's creditors.

**D.      Sale Free and Clear of Liens, Claims and Encumbrances is Appropriate**

47.     The Debtor further submits that it is appropriate that the Property be sold free and clear of all liens,[6] claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code.   Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under Bankruptcy Code section 363(b) free and clear of any liens, claims, encumbrances, and other interests of an entity other than the estate if one of the following conditions is satisfied:

(1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

---

[6]      The Debtor does not believe that there are any liens on any of its property supported by collateral.  As set forth above, the noteholders (led by Mr. Chen, who is affiliated with the Buyer) have large allegedly secured claims, but the sole collateral is non-existent account receivable.

RLF1 13165524v.3

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

48.     Because section 363(f) is stated in the disjunctive, when selling property of the estate, it is only necessary to meet one of the five conditions listed in that section. *See Folger Adam Sec. Inc. v. De Matteis/MacGregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) (noting that a debtor is authorized to sell property free and clear of "any interest" if any one of the five prescribed conditions under section 363(f) is met); *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988)); *In re DVI, Inc.*, 306 B.R. 496, 504 (Bankr. D. Del. 2004) (approving sale free and clear of interests where debtors met only the conditions of 363(f)(4)).

49.     To facilitate the Sale proposed herein for the benefit of all creditors, it is necessary to authorize the sale of the Property free and clear of any and all liens, claims, encumbrances, or other interests, including rights or claims based on any successor or transferee liability, other than the liabilities assumed by the Buyer, with any such liens, claims, encumbrances, or other interests to transfer to and attach to the net proceeds of the Sale with the same rights and priorities therein.

50.     The Sale of the Property will satisfy section 363(f) of the Bankruptcy Code because any known entities holding liens, claims, encumbrances, or other interests on the Property will have received notice of this Motion. All known parties in interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that

does not object to the Sale should be deemed to have consented. *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who *might* have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted) (emphasis in original); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  As such, to the extent that no party holding liens, claims, encumbrances, or other interests objects to the relief requested in the Sale Order, the sale of the Property free and clear of all liens, claims, encumbrances, or other interests (to the extent set forth in the Purchase and Sale Agreement), satisfies section 363(f)(2) of the Bankruptcy Code.

51.     Accordingly, the Debtor requests that the Property be transferred to the Buyer, free and clear of all liens, claims, encumbrances and other interests (to the extent set forth in the Purchase and Sale Agreement), with such liens, claims, encumbrances, and other interests to attach to the net sale proceeds of the Property.

**E.     <u>Auction of the Property is Not Required</u>**

52.     Bankruptcy Rule 6004(f)(1) permits private sales or sales conducted without an auction.  Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").  Further, courts have generally held that a debtor has broad discretion in determining the manner in which assets are sold.  *Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of sale is within the discretion of the trustee . . . ."); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a

trustee has "'ample discretion to administer the estate, including authority to conduct public or private sales of estate property.'") (citing *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991)). As long as a debtor maximizes the return to its estate, a court should defer to a debtor's business judgment regarding how to structure an asset sale. *Bakalis*, 220 B.R. at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); *In re NEPSCO*, *Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate."). Accordingly, if the Debtor concludes that conducting a private sale, as opposed to a public auction, is in the best interests of their estates, the Debtor should be permitted to do so. *See Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

53. The Debtor's decision to pursue a sale without an auction is supported by several key facts. First, the Debtor has not been in operation for over a year and is not selling its business as a going concern. As set forth above, in June 2014, IATA revoked the Debtor's license to purchase tickets in the international market to resell, and therefore, the Debtor has not been able to earn any money since that time. Accordingly, the Debtor is not selling a typical operating business that has numerous assets to sell and employees to transfer, in contrast, the Debtor is selling discrete intellectual property and other specified assets.

54. Second, GlassRatner has been actively involved with the Debtor's business and sale prospects since April 2015. Based on GlassRatner's experience in similar transactions, and

RLF1 13165524v.3

familiarity and involvement with the Debtor's business since April 2015, GlassRatner believes there are no other parties interested in purchasing the Debtor's Property.

55.    Third, if required to run a formal sale process, the Debtor would need to hire a separate investment banker to market the assets.  The cost of retaining an investment banker and running a marketing process would deplete any possible (and unlikely) benefit of an increase in consideration provided by another potential buyer.  Moreover, the Debtor does not have the funding to run a formal sale process.  The Debtor has no debtor in possession financing and little cash, and therefore cannot fund a forty-five day case.  A formal sale process would cause an increase in the administrative costs to the Debtor which would likely cause conversion and the loss of the Sale.  As a result, the additional cost of a formal sale process would be to the detriment to the Debtor's estate and its creditors.  Accordingly, the Debtor's decision to sell the Property to the Buyer pursuant to the Purchase and Sale Agreement is supported by the Debtor's business judgment and should be approved.

56.    Nonetheless, consistent with the Debtor's fiduciary duties to ensure the greatest return to creditors and the estate, the Sale remains subject to higher and better offers. Specifically, the Purchase and Sale Agreement provides that if the Debtor receives a bid, which among other things, is at least $50,000 over the sum of the Purchase Price, the Break-Up Fee and the maximum Expense Reimbursement four (4) days prior to the hearing on this Motion, then the Debtor shall hold an auction for the Assets.  Accordingly, if the Debtor determines in good faith that it received a higher and otherwise better offer for the Property before the hearing on this Motion, then the Debtor has the ability to consummate an alternative transaction for the benefit of its estate and creditors.

RLF1 13165524v.3

**F.**    **Buyer is Entitled to Protections as a Good Faith Buyer**

57.    The Buyer is purchasing the Property in good faith and are entitled to the full

protections of section 363(m) of the Bankruptcy Code.  Section 363(m) of the Bankruptcy Code

protects a good-faith purchaser's interest in property purchased from the debtor, notwithstanding

that the sale conducted under section 363(b) is later reversed or modified on appeal.

Specifically, section 363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b) of the Bankruptcy Code] of a sale . . . of property
> does not affect the validity of a sale . . . to an entity that
> purchased . . . such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

58.    While the Bankruptcy Code does not define "good faith," the Second Circuit has

held that the good faith of a purchaser is shown by the integrity of his conduct during the course

of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding

may not be made.  *See e.g.*, *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390

(2d Cir. 1997) ("A purchaser's good faith is lost by fraud, collusion between the purchaser and

other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders")

(internal citations omitted); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1998) (same).

59.    The Debtor requests a finding that the Buyer is a good faith purchaser entitled to

the protections of section 363(m).  The terms and conditions of the Purchase and Sale Agreement

have been negotiated by the Debtor and the Buyer at arm's length and in good faith.  The Buyer

was represented by qualified counsel and the Debtor believes that the Buyer has not engaged in

any conduct that would indicate or constitute a lack of good faith.  *See In re Gucci*, 126 F.3d at

392 ("Good faith of a purchaser is shown by the integrity of his conduct during the course of sale

proceedings . . . ."); *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996) (stating that a purchaser's good faith status would be destroyed only by conduct involving "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'") (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). Accordingly, the Debtor believes that the Buyer is entitled to the protections that section 363(m) of the Bankruptcy Code provides to good faith purchasers. In addition, neither the Debtor nor the Buyer have engaged in any conduct that would cause or permit the application of section 363(m) of the Bankruptcy Code to the transactions contemplated by the Purchase and Sale Agreement.

### G. Approval of Break-Up Fee and Expense Reimbursement

60.    To the extent the Debtor enters into an Alternative Transaction or in other limited specified circumstances, the Debtor is also requesting approval of a break-up fee equal to 4% of the Purchase Price (**the "Break-Up Fee"**) and reimbursement of expenses for up to $150,000 for reasonable documented costs and expenses incurred (**the "Expense Reimbursement", and together with the Break-Up Fee, the "Bid Protections"**).

61.    Bankruptcy Courts in the Second Circuit analyze the appropriateness of bidding incentives such as these under the "business judgment rule" standard. It is well established in this district that courts consider whether (a) the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation, (b) the fee hampers, rather than encourages bidding and (c) the amount of the fee is reasonable relative to the proposed purchase price. *See Integrated Res.*, 147 B.R. at 656-57 (to evaluate bid protects, courts should employ the business judgment rules, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment) (internal citations

omitted).  The Debtor submits that the Bid Protections pass the muster under each of the three foregoing factors.

62.     First, the Bid Protections are the product of good faith, arm's-length negotiations between the Buyer and the Debtor, who was acting not in its own self-interest but, rather, in the interest of the bankruptcy estate consistent with its fiduciary duties.  Further, the provisions of the Purchase and Sale Agreement relating to the Bid Protections (as well as the other provisions therein) were scrutinized by the Debtor's advisors and professionals.

63.     Second, the Debtor believes, based on its reasoned business judgment, that the Bid Protections will provide a material benefit to the estate by setting a floor price which, if anything could encourage additional offers for the Property by demonstrating that the Buyer (and Mr. Chen personally) see value in the business.  The Bid Protections were a material inducement for, and a condition of, the Buyer's agreement to enter into the Purchase and Sale Agreement. Indeed, granting these Bid Protections convinced the Buyer to enter into the Purchase and Sale Agreement, which as discussed herein has been the only offer for the Property and assures the Debtor of a sale of the Property to a contractually-committed bidder at a price it believes is fair and reasonable and provides the upside opportunity that the Debtor could potentially receive a higher or otherwise better offer for the Property.  *See In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives "legitimately necessary to convince a white knight to enter into the bidding by providing some form of compensation for the risks it is undertaking") (internal citations omitted).

64.     Third, the Debtor believes, based on its reasoned business judgment, that the Bid Protections are reasonable and appropriate relative to the size, nature and complexity of this

transaction and the commitments made and resources expended by the Buyer in connection therewith in view of:

- the meaningful floor established by the Purchase Price in the Purchase and Sale Agreement for competitive bidding;

- the need of the Debtor to move forward with a transaction with a high likelihood of closure assured by a contractually committed party at a fair and reasonable price consistent with the needs of this case given the lack of funding and operations; and

- the extensive due diligence, analysis and negotiations undertaken by the Buyer in connection with the proposed transaction.

65.   Further, the amount of the Bid Protections is equal to the amount of the deposit of the Purchase Price that has or will be provided by the Buyer.  The Purchase and Sale Agreement provides that if there is a termination by the Debtor pursuant to certain conditions set forth therein, the deposit shall be immediately delivered to the Debtor.  As a material inducement for the Buyer to provide the deposit, the Debtor agreed that the Bid Protections would equal the amount of the deposit.

66.   Accordingly, the Debtor submits that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances and, because the standard used by courts in this district in approving similar protections has been satisfied here, the Debtor respectfully submits that the Bid Protections should be approved.

## ASSUMPTION OF CONTRACTS

67.   In order to facilitate the Debtor's assumption and assignment of certain Contracts to the Buyer in an expeditious fashion, while simultaneously ensuring to all Contract counterparties adequate notice and an opportunity to object, the Debtor proposes to establish certain Assumption Procedures for assuming and assigning prepetition Contracts to the Buyer pursuant to section 365 of the Bankruptcy Code.  The Assumption Procedures are reasonably calculated to provide all counterparties to the Contracts with proper notice of the potential

RLF1 13165524v.3

assumption and assignment of the Contracts, Cure Amounts, if any, and the deadline to object to Cure Amounts.

## A.    Determination of Assumable Contracts

68.    On or before the date that is not less than fourteen (14) days prior to the hearing to consider the relief requested in this Motion (the "**Sale Hearing**"), the Debtor shall file a notice of assumption (the "**Assumption Notice**") with the Court and serve such notice via first class mail on each counterparty to a Contract listed thereon.  The Assumption Notice will list all Contracts of the Debtor related to the Property that the Debtor and the Buyer believe may be assumed and assigned in connection with the sales proposed herein (the "**Assigned Contracts**").  The Assumption Notice will also include a good faith estimate of the Cure Amount applicable to each such Assigned Contract (and if no Cure Amount is estimated to be applicable with respect to any particular Assigned Contract, the Cure Amount for such Assigned Contract is listed as $0.00).

## B.    Contract Assumption Objection Procedures

69.    Any objections to the assumption and/or assignment of any Contract identified as an Assigned Contract, including to the Cure Amount set forth on the Assumption Notice, must be in writing, filed with the Court, and actually received by the relevant notice parties set forth in the Assumption Notice no later than seven (7) days after the date on which the Debtor files and mail the Assumption Notice (together, the "**Assumption and Cure Objection Deadline**").

70.    If no objections are received by the Assumption and Cure Objection Deadline, then the proposed assumption and assignment is authorized and the Cure Amounts set forth in the Assumption Notice shall be binding upon the contract counterparty for all purposes and will constitute a final determination of the total Cure Amount required to be paid to the counterparty in connection with the assumption and assignment to the Buyer.  In addition, any counterparty to an Assigned Contract that does not file an objection prior to the Assumption and Cure Objection

RLF1 13165524v.3

Deadline shall be forever barred from objecting to the Debtor's proposed assumption and assignment to the Buyer and the Cure Amount set forth in the Assumption Notice, including, without limitation, the right to assert any additional cure or other amounts with respect to the Contract arising or relating to any period prior to such assumption or assignment.

71.    If a timely objection is received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing or any later date set by the Court (an "**Assumption Hearing**").  The pendency of a dispute relating to Cure Amounts will not prevent or delay the assumption and assignment of any Contracts.

**C.**    **Assumption and Assignment of Executory Contracts and Unexpired Leases is Appropriate**

72.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."   11 U.S.C. § 365(a).   Upon finding that debtors have exercised their sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

73.    Section 365(b)(1) of the Bankruptcy Code requires that a debtor in possession meet certain additional requirements to assume a lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  These requirements do not, however, apply to a default that is a breach of a provision relating to any of the following events:

> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;

> (B) the commencement of a case under [the Bankruptcy Code];

> (C) the appointment of or taking possession by a trustee in a case under [the Bankruptcy Code] or a custodian before such commencement; or

> (D) the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

*Id* § 365(b)(2).

74.    Accordingly, section 365(b)(1) of the Bankruptcy Code requires that the Debtor cures, or provides adequate assurance that it will promptly cure, any outstanding defaults under the Assigned Contracts.

75.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in possession may assign an executory contract or lease if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of [section 365 of the Bankruptcy Code]; and

> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*Id.* § 365(f)(2).

30

76.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

77.     At the Assumption Hearing, to the extent necessary, the Debtor will be prepared to proffer testimony or present evidence to demonstrate the ability of the Buyer to perform under the Assigned Contracts.  The Assumption Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Buyer to provide adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

## **REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(H) AND 6006(D)**

78.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) similarly provides that an order authorizing the assignment of an executory contract or unexpired lease under section 365(f) is stayed until the expiration of fourteen days after entry of

the order, unless the court orders otherwise.  Fed. R. Bankr. P. 6006(d).  The Debtor requests that the Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NOTICE

79.    No trustee or examiner has been appointed in this chapter 7 case.  Notice of this Motion shall be given to:  (a) the Office of the United States Trustee, (b) counsel for the Buyer; (c) counsel for the Petitioning Creditors; (d) all known creditors of the Debtor; (e) all parties asserting a security interest in the assets of the Debtor to the extent reasonably known to the Debtor, (f) various federal, state, county and city tax and regulatory authorities, and (g) all parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor respectfully submits that no further notice of this Motion is required.

## NO PREVIOUS REQUEST

80.    No previous request for the relief sought herein has been made by the Debtor to this or any other court.

RLF1 13165524v.3

WHEREFORE the Debtor respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: October 26, 2015
       New York, New York

**ARENT FOX LLP**

*/s/ George V. Utlik*
George V. Utlik
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
george.utlik@arentfox.com

Aram Ordubegian
(admitted *pro hac vice*)
Andy S. Kong
(admitted *pro hac vice*)
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Telephone: (213) 629-7400
Facsimile: (213) 629-7401
aram.ordubegian@arentfox.com
andy.kong@arentfox.com

-and-

**RICHARDS, LAYTON AND FINGER, P.A.**

Russell C. Silberglied (#3462)
(admitted *pro hac vice*)
Daniel J. DeFranceschi (#2732)
(*pro hac vice* application forthcoming)
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 498-7545
silberglied@rlf.com
defranceschi@rlf.com

*Proposed Counsel to the Debtor*